814 So.2d 710 (2002)
STATE of Louisiana, Appellee,
v.
Louis Charles CARTER, Appellant.
No. 35,530-KA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 2002.
Rehearing Denied May 2, 2002.
*711 Louisiana Appellate Project, by J. Wilson Rambo, for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, H. Stephens Winters, Assistant District Attorney, for Appellee.
Before NORRIS, STEWART and PEATROSS, JJ.
STEWART, Judge.
The defendant, Louis Carter, was tried and convicted of aggravated arson. He was sentenced to twelve years at hard labor. All but the first six years were suspended, and the first two years of the six years were ordered to be served without benefit of probation, parole or suspension of sentence. The defendant was also placed on supervised probation for four years. The defendant now appeals and raises several assignments of error. However, we find that the resolution of one issue pretermits discussion of the others. On the basis of this issue, we reverse the defendant's conviction and sentence and remand the case for the appointment of a sanity commission.

FACTS
In October 1998, Jock Bell was the manager of the Cypress Manor Apartments ("Cypress") in Monroe, Louisiana. The defendant resided alone in apartment number 921 of Cypress at that time. On October 6, 1998, the day of the fire at issue, Marvin Beasley, an apartment resident and apartment maintenance worker, saw the defendant moving several items out of his apartment and stacking them in front of the apartment door. Beasley asked the defendant if he was about to move, but the defendant did not respond. Beasley then went to the office and told Bell of the defendant's actions. When Beasley returned to the defendant's apartment, he saw the defendant drag a mattress toward the kitchen of the defendant's apartment and leave the mattress next to the stove. The defendant left the bottom part of the mattress positioned against the bottom of the cabinet and the top part of the mattress positioned over the stove and on the electric burner.
*712 Before the apartment fire began, Bell also observed that the defendant had moved some of his property out of his apartment and into the walkway. Bell was in his office when he was alerted that there was a fire in defendant's apartment. The Ouachita Parish Fire Department responded to the fire alarm at 10:26 p.m. A subsequent investigation revealed that a stove top burner of the stove in the defendant's apartment was in the "on" position. This burner ignited the mattress and was the cause and origin of the fire. The fire and resultant smoke and water damage displaced 25 apartment residents, damaged approximately 40 apartment units and caused approximately $100,000.00 worth of damage to the apartment complex. During trial, Beasley testified that, while the fire blazed, he observed the defendant hiding in some bushes and watching the fire.
Approximately four days after the fire, Carter approached Janice Roan at the Plasma Center. He asked Roan, a resident of the Cypress apartments, if she liked what he had done, and stated that he was not "through." The defendant told Roan that he was going to go back to burn up building number 500, and that he was going to burn the rest of the buildings down. Subsequently, the defendant was arrested and charged with aggravated arson.
On January 20, 1999, a 72 hour hearing was held and the defendant informed the trial court that he could not afford an attorney. The trial court appointed the Indigent Defender Board to represent the defendant. On November 8, 1999, the defendant filed a pro se motion for discovery and "to call witnesses." The defendant's motion requested that his defense attorney, Charles Kincade, be dismissed and that he be allowed to present his own defense. The defendant also requested a continuance to prepare for his defense by serving witnesses with subpoenas and filing discovery. The defendant stated that he had been doing groundwork by gathering all of his witnesses and documents, and would appreciate extra time within which to complete his preparation. The trial court twice asked the defendant whether he needed any help, and the defendant twice declined the offer. The trial court advised the defendant that he was charged with aggravated arson and asked whether the defendant had ever represented himself before. The defendant replied that he did his homework, using books and the library, and thought that he could "pretty much" handle it. Carter further stated that he did not have any faith in his defense attorney, and would not accept his assistance at trial. The trial court then asked the defendant if he knew how to subpoena witnesses and who he wanted to subpoena. The defendant stated that he would have to get the names. Then the trial court asked the defendant if he knew how to pick a jury. Carter responded, "that shouldn't be no problem." After a recitation of the facts upon which the charge was based, and a discussion of the sentencing range, the trial court asked the defendant about his formal education. Carter answered that he finished high school. The following colloquy occurred:
By the Court: And do you have any Mr. Carter, do you have any history of mental illness or anything like that?
By Mr. Carter: Years ago.
By the Court: Are you under any kind of medical care right now?
By Mr. Carter: No, other than, you know, disability on my knee.
The court noted that the defendant's pro se motion requested that the November trial date be delayed to allow him time for trial preparation. The trial court then asked the defendant if the January 10th trial date suggested by the state would *713 give him enough time to prepare, to which Carter responded, "yes, sir, it sure will." The trial court then asked the state if a plea bargain had been offered. Mr. Winters, the assistant district attorney, responded that a plea bargain had not been discussed because Mr. Carter was vehement throughout the proceedings that he desired a trial. The trial court asked the defendant if he was interested in talking to the district attorney about a plea. The defendant stated "No." Mr. Kincade, the defendant's defense counsel, was asked by the trial court if he knew any reason why this defendant could not represent himself. Mr. Kincade stated that, except for the fact that he thought it was always inadvisable, the defendant was entitled to his constitutional right of self-representation. The trial court took the matter under advisement and made sure that the transcripts requested by the defendant in his pro se motion would be provided to him.
During the proceedings held the next day, the trial court stated that it had reviewed the law governing self-representation including its obligation of making the defendant aware of the dangers of self-representation, and of ascertaining the defendant's competency. The trial court then noted the fact that the defendant graduated from high school, could read and write the English language, and expressed confidence in his ability to represent himself. The trial court reiterated the fact that the defendant was charged with aggravated arson, and noted the seriousness of the offense. The trial court then asked the defendant if he had all the information necessary to conduct his own defense. Carter stated that he was in the process of gathering it, and Mr. Kincade stated that he received full discovery from the state and would supply all of the information he had to Carter. The following colloquy transpired:
By the Court: Do you know how to pick a jury? You are going for a jury trial? That's your right.
By Mr. Carter: Absolutely.
By the Court: Do. You know what's involved in that?
By Mr. Carter: Yes, sir.
By the Court: Just give me a brief overview. What do you thinkhow does it work? Tell me how it works.
By Mr. Carter: Well, if they have read anything in the newspaper oryou know, differentyou know, personal feelings and personally know me, et cetera.
By the Court: See those men over there.
By Mr. Carter: Yes, sir.
By the Court: Let's pretend they're the jury. What kind of questionswhat would you like to know about them before you pick them?
By Mr. Carter: That would be giving away myyou know, my strategy or my defense.
By the Court: You do have a strategy?
By Mr. Carter: Yes, sir.
The trial court again asked the defendant, "Do you have any history of mental illness or anything like that? I think you indicated yesterday you were on some medication." Carter stated that he was not on any medication other than for his knees, and he discussed with the court his disability income from the knee injury.
The trial court then found that the defendant appeared to be competent, and the trial court relieved Mr. Kincade from his service as defense counsel. Again, the trial court asked the defendant if he needed any help preparing for the trial, to which the defendant responded, "No, sir." The trial court then ascertained that the clerk had the defendant's proper mailing address for service of official paperwork. *714 The trial date was fixed for January 10, and the trial court suggested to the defendant that he contact the district attorney's office during the week before trial to see if the case was still scheduled for trial.
Following a trial, the defendant was found guilty of aggravated arson by a jury on November 7, 2000. On or about November 21, 2000, the defendant filed a pro se pleading entitled "Civil Prisoner's Rights." On January 9, 2001, the defendant appeared for sentencing. The trial court asked the defendant questions about his background. Particularly, the trial court asked the defendant's age (43) and inquired whether the defendant suffered from any mental disabilities. The defendant stated that he had never been prescribed a medication for a mental condition, and had never had any kind of special mental health care. In response to further questions from the trial court, the defendant stated that he had never been convicted of a felony, but he had a few misdemeanor convictions for trespassing, drunk and disorderly conduct, and fighting. He also admitted that he was previously charged regarding an incident in which his wife was burned.
The trial court then reviewed the presentence investigation report. The judge noted that Carter had reported a history of schizophrenia and depression to investigators. When asked if he admitted setting the building on fire, the defendant adamantly denied his guilt. The trial court noted that the PSI only showed some prior misdemeanors. Before sentencing the defendant, the trial court noted the lack of provocation for the crime, and the danger that the defendant would commit another such crime if released. The trial court stated, "I'm groping for some explanation of this and hoping you will give me some explanation of this and you'll give me some clue as to what to do with you other than locking you up, but I don't know. I can't figure out why this happened other than the possibility that you may just be nuts." (Emphasis added).
Subsequently, the trial court sentenced the defendant to serve twelve years imprisonment at hard labor. All but the first six years were suspended, and the first two years of the six years were ordered to be served without benefit of probation, parole or suspension of sentence. In lieu of the suspended portion of the sentence, the defendant was placed on supervised probation for four years. The trial court also ordered a mental health evaluation and treatment upon his release.
A hearing was held on the defendant's pro se pleading on January 30, 2001. On February 14, 2001, the trial court ruled that the pro se pleading was, in essence, a motion to reconsider sentence, and denied the motion. The defendant now appeals his conviction and sentence.

DISCUSSION
It is the trial court's findings as to the competency of the defendant to stand trial and represent himself that we find problematic. Our review of the record dictates that the trial court erred in failing to appoint a sanity commission to test the defendant's capacity to proceed.

Competency
Due process requires that states adopt adequate anticipatory measures to minimize the risk that an incompetent person may be tried and convicted. Medina v. California, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). Under Louisiana law, it is presumed that a defendant is sane and competent to proceed. La. R.S. 15:432. Moreover, the appointment of a sanity commission is not a perfunctory matter or a ministerial duty of the trial court, nor is it guaranteed to every accused in every case. State v. Hunt, 34,945 *715 (La.App. 2nd Cir.9/26/01), 797 So.2d 138 citing State v. Nix, 327 So.2d 301 (La. 1975) cert denied 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198. Nonetheless, our statutory scheme for detecting mental incapacity "jealously guards a defendant's right to a fair trial." State v. Carney, 25,518 (La.App. 2nd Cir.10/13/95), 663 So.2d 470 quoting State v. Nomey, 613 So.2d 157, 161 (La.1993); State v. Rogers, 419 So.2d 840 (La.1982); La.C.Cr.P. art. 641 et seq. La.C.Cr.P. art. 643 provides that "the court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed." Reasonable ground consists of objectively considered information which raises a reasonable doubt about the defendant's competency, that the defendant can neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense.
The defense contends that the transcript of the voir dire evidences that the defendant had no knowledge of concepts of peremptory challenges and challenges for cause, and, in fact, didn't question anyone in the first two panels of prospective jurors. Only after granting the state's challenges for cause did the trial court explain the voir dire process to the defendant.
Also, the defense argues that the state did not meet its burden of proving that the defendant knowingly, intelligently and voluntarily waived his right to counsel, or that the defendant was adequately informed of the dangers and disadvantages of self-representation. It notes that before granting the defendant's request to represent himself, the trial court only asked a the defendant few basic questions about his formal education and his knowledge of the process of subpoenaing witnesses, and picking a jury.
We find that the court was thorough in its inquiry of Carter's knowledge of trial procedures. However, we find that in spite of the defendant's disclosure that he had a history of mental illness, the trial court only conducted a perfunctory inquiry regarding the defendant's mental history and did not determine the exact nature or degree of any previous mental illness. Given the defendant's bizarre behavior before and after the fire, it was incumbent on the trial court to examine documents filed in the record and to make further inquiry into the defendant's mental state before allowing him to stand trial or represent himself. Particularly, the defense points to investigative reports filed in compliance with discovery, which detailed the defendant's aberrant and bizarre behavior and statements made at the time of the offense. Vonda Thompson testified that on the date of the incident, Carter was walking around with a lamp shade on his head muttering about alien conspiracies. Further, Jock Bell testified that Carter barged in his office and stated that Bell was "keeping the women and babies in bondage and that I needed to let his people go." Bell also stated that Carter told him that "he could get his will done without lifting a finger, that his disciples would do it for him ... pharaoh let my people go or you'll suffer my wrath." Most revealing is the trial judge's statement at the conclusion of trial that the defendant was more than likely "nuts," after reviewing the presentence investigation report, which contained the observations of the investigating officers.
The arresting officer testified that upon his arrest, Carter stated that "the apartment manager was conspiring with aliens to have him arrested for setting the fire." Carter also stated that the "aliens" were holding juvenile residents of Cypress hostage and that they needed to be set free. The officers also noted that Carter went into great detail describing the aliens as having "big eyes." When asked by the officers about the many superficial scratches *716 on his arms, Carter stated that he sustained the injuries while freeing "the alien women from the sticker bushes." When the officers questioned Jock Bell about Carter's bizarre behavior, Bell stated that Carter had a habit of walking around with nothing more than a blanket covering his body and "preaching" about alien conspiracies. Carter also stated to the officers that he had been diagnosed with schizophrenia in 1984 and had been taking medication up until the time of his arrest.
The state argues that the defendant was adamant and unequivocal in his assertions that he did not want, and would not accept, assistance of counsel. It also notes that the trial court conducted an exhaustive interview with the defendant before determining that he was competent. The state asserts that the trial transcript indicates the defendant's ability to cross-examine witnesses and to give a concise and respectful opening statement. The state admits that the defendant's conduct and statements during the commission of this crime are "odd at best." However, it argues that the record supports the trial court's finding that the defendant's choice to represent himself was free and voluntary, and that he was advised of the dangers of self-representation. Although we find that the record does have the assertions of the defendant that he was capable of representing himself and that he had a familiarity with court processes, we also find that it does not support a free and voluntary waiver of the assistance of counsel by the defendant, nor does it demonstrate that he was competent to stand trial.
Even though the Sixth Amendment grants an accused the right of self-representation, the propriety of allowing a defendant to make this election shall not be judged by what happens in the subsequent course of that representation. Rather, it is the record made in recognizing the waiver that controls. See: State v. Kennon, 588 So.2d 1348 (La.App. 2d Cir.1991), writ denied, 600 So.2d 634 (La.1992); State v. Dupre, 500 So.2d 873 (La.App. 1st Cir. 1986), writ denied, 505 So.2d 55 (La.1987).
Regardless of the Sixth Amendment implications of the defendant's choice to represent himself, the touchstone issue is his competence to stand trial. Although the record reflects that the trial court questioned the defendant regarding his knowledge of trial procedures during the proceedings held on the defendant's pro se motion to represent himself, the adequacy of the defendant's self-representation and legal competence are not determinative of a valid waiver of counsel. State v. Moore, 29,212 (La.App. 2nd Cir.1/22/97), 687 So.2d 647.
The record before the trial court was replete with examples of the defendant's bizarre and erratic behavior both before and after the fire at issue. In light of the evidence, the defendant's mental condition should have been explored by the trial court or by his court appointed attorney requesting a sanity commission. Because of this failure, we cannot find that the defendant was competent to stand trial or represent himself.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are reversed and remanded and we order the trial court to appoint a sanity commission.
REVERSED AND REMANDED.

APPLICATION FOR REHEARING
Before NORRIS, C.J., STEWART, GASKINS, PEATROSS and DREW, JJ.
Rehearing denied.